Mr. Justice Olin
delivered the opinion of the court as follows:
The first question presented in the case is, what are the powers conferred on the board of health under the statute ¶ The language of the act seems hardly susceptible of doubt or controversy, and its meaning perfectly obvious. It is this: “The board of health shall be empowered to declare what nuisances are injurious to health, and provide for the removal thereof.” But the interpretation placed upon this section by the board of health and insisted upon by its counsel, is, that the board of health is empowered to declare anything or any condition of things to be a nuisance which, in the exercise of its judgment and discretion, is deemed injurious or dangerous to health, and proceed to deal with it as such, although the thing or condition of things declared to be a nuisance was never, before the passage of this ordinance by the board, deemed, taken, or adjudged to be such by the rules of the common law, or in pursuance of any statute law relating thereto for governing this District. Snch a construction of the statute would confer a most extraordinary legislative power and a very summary mode for its exercise. The power claimed by the board, I hesitate not to say, is not possessed by Congress or any legislative assembly in any *442 State of this Union, nor can it be conferred until the Constitution of the United States becomes a dead letter. I will attempt to show this; but, first, it may be proper to consider what is the consequence by the rules of the common law of making or maintaining a nuisance, and especially a nuisance injurious to health. Such a nuisance is an offense against the whole community where it exists, and every individual of this community has the right to remove it; that is, to abate it by force, if need be. A nuisance, by the rules of the common law, is nearly as well defined as is the offense of assault and battery. It is, says Blackstone, “ annoyance, anything that worketh hurt, inconvenience, or damage.” 3 Bl. Com., 215. A far better definition of a nuisance will be found in 9th Co., 58 n. d. c., William Aldred’s case, and by Lord Mansfield, 1st Burr., 337, and it is this: “ Anything that renders the enjoyment of life and property uncomfortable.” I think this definition would be nearly perfect if you but add, Anything which naturally and necessarily tends to deprave and corrupt the morals of the-community. By the rules of the common law, where such nuisance exists any member of the community has the right to abate it; that is, to take the law into his own hands and destroy or remove it.
But there are many things nuisances by the common law which are not injurious to health, and this fact alone seems to me to offer a key, as it were, to the interpretation of the section of the act of Congress here quoted. I need only in this connection refer to one or two cases. In Hall’s case, (1st Mod., 76,) Hall, a rope-dancer, had erected a stage or was about erecting one at Charing Cross, and the Court of King’s Bench pronounced it a nuisance and ordered its removal— abatement — and this upon the authority, as Lord Chief-Justice Holt states, of a case occurring in the reign of Charles I. Noy came into court and prayed a writ to remove a bowling-alley erected near St. Dunstan’s Church, and had it (See 2 Keb., p. 8, 116.) Here a writ was granted to remove the bowling-alley wdthout any presentment at all; and says a learned judge, (see 5 Hill, 124,) the tendency of the alley, being w'ell known, it was adjudged to be a nuisance of itself, and a writ accordingly issued to remove it without any trial.
In the case of the People vs. Sargant, 8 Cowen, 129, the *443 same court which decided that a bowling-alley kept for gain and hire was a nuisance, decided that a billiard-room kept for the same purpose was not. It is somewhat difficult, I confess, to discover the principle which makes the bowling-alley a nuisance in and of itself, and a billiard-room kept for the same purpose no nuisance at all. Perhaps the distinction in the two cases consists in the fact that knocking down pins with wooden balls disturbs the quiet of a neighborhood more than does the punching of a small ivory ball around a table covered with cloth. I mention these cases for two purposes: first, to show that there are nuisances by the common law which are not injurious to health, but, on the contrary, are eminently conducive to it, such as the exercise at the bowling-alley or the billiard-table for men of sedentary habits. The most learned of the profession, to whom is committed the care of our health, and often our lives, have recommended such exercise as most salutary. And second, to show what legal consequences follow the keeping or maintaining of a nuisance. It will be observed, it is stated that "Noy came into the court of King’s Bench and prayed for a writ to remove a bowling-alley erected under the eaves of Saint Dunstan’s Church,” and the writ was granted without any presentment or trial. This would seem a pretty summary proceeding, which in effect destroyed a man’s property, and condemned him without trial or hearing, and yet the decision was in strict conformity to law, if it be conceded that a bowling-alley is per se a nuisance. The Court of King’s Bench assumed no more power in issuing a writ to remove it than might have been exercised by the whole congregation of Saint Dunstan’s Church, though when done under the authority of a judicial writ, executed by the sheriff, it would probably be done in a more quiet and orderly manner than by a mob composed of the congregation and the neighbors.
Cowen, J., says that the decision in Hall’s case is not because rope-dancing, or playing at nine-pins, or any other game with bowls is a mischief, nor that being a spectator at a rope-dance is censurable in the least. In themselves they are innocent. This nuisance consists in the common and gainful establishment for the purpose of sports, and having an aptitude and tendency, as Hawkins says, (1 Hawkins, p. *444 6, by Curwood, Ch. 32, p. 6,) to induce idleness, and draw together great numbers of disorderly persons, which cannot but be very inconvenient to the neighborhood. If the decision in Hall’s case had been placed upon the ground, not that a bowling-alley was a nuisance per se, but that erecting a bowling-alley beside a church, which had been a place of worship for a much longer period than Bates’s soap and candle factory has existed, which is said to be only some forty years, it would to my mind be much more satisfactory. Many things perfectly innocent, in and of themselves, may-become a nuisance by reason of surrounding circumstances. Thus a bowling-alley erected so near a church as, when employed, to interfere with the decent solemnity of worship is a nuisance; and so while music at the proper time and place is a delightful enjoyment, yet if the Marine Band should appear daily before the City-Hall during the sessions of this court, and discourse music ever so well, I think this court could treat the band as a nuisance and remove it in a summary way.
It will thus be seen that a nuisance, by the rules of the common law, is a kind of caput lupinum, which any and everybody is authorized to knock in the head; that is, destroy-abate. So if the passage of the section I have before quoted, made the boiling of fat, tallow, grease, or swill, except for cooking purposes, a nuisance, anybody and everybody may lawfully put an end to it by force, if necessary. This ordinance then, if enforced, would in effect work a confiscation of all Bates’s property employed in the manufacture of soap and candles; for it is absurd to say you do not confiscate a man’s property when you prohibit the use of it for the purposes it was designed for, and in the only way iu which it can be made valuable. It is, in substance, the same as to enact that whoever owns a horse may keep it, take good -care of it, but shall not sell it, or use it any- way in which horses have heretofore been used or can be profitably used-It is quite possible that all the heating-apparatus, kettles, tubs, and other contrivances used in the manufacture of soap and candles may be used in some other branch of industry, and thus not be wholly destroyed. We are not advised how that may be; perhaps his kettles or caldrons could be employed in "boiling swill;” but, alas! that branch of industry *445 is prohibited by this ordinance, “except for cooking purposes.” As man is the only animal who has hitherto contrived to cook his food, this ordinance graciously exempts-from its penalties all who desire to boil sic ill for cooking-purposes. It is devoutly to be hoped that the beneficiaries under this exception are not very numerous in this District I have thus far attempted to show that the power conferred on the board of health did not authorize it to declare a thing, or any condition of things, to be a nuisance, which in their judgment or discretion was injurious to health, which thing or condition of things was no nuisance by the rules of the common law, or any statute law in force in this District; but simply the power to declare what nuisances were injurious to health.. In other words, it was not a power to make a thing a nuisance which was no nuisance at all prior to the passage of this-ordinance. It is said to be “ an ill wind that blows nobody any good,” and the prohibition to manufacture candles may promote the interest of the gas-companies of the District, and. when a monopoly of the business of lighting our houses is given to these companies, the quality of the gas, doubtless, wilL be somewhat improved, and the price considerably reduced. All monopolies are, by some modern political economists, said to have that tendency. If cleanliness be the next thing to godliness, the good people of this District should all desire an abundant supply of soap and Potomac water. No one who passes daily the streets and avenues of this city but will have occasion to regret the sparing use of both. The manufacture of soap and candles has hitherto, in the world’s history, been taken and deemed to be an honest and useful branch of business, and one to be promoted and encouraged ; but if it be in and of itself a nuisance “ injurious to health,” it ought to be stopped, because life and health are dearer rights than the right of property, and when the latter interferes with the higher rights of life and health, it- must give Avay. If the manufacture of soap and candles is a nuisance, it is equally so anywhere else as well as on G- street. If it be injurious to the health of the neighborhood, it must be still more dangerous to the health of those engaged in the business, and why not, therefore, prohibit the manufacture soap and candles everywhere? Upon what theory is *446 declared to be a nuisance injurious to health within the limits of the cities of Washington and Georgetown, and outside of those limits, impliedly, no nuisance at all Í Are the good people of this District outside of the limits of those cities not to be protected against nuisances injurious to health ? The board of health is appointed for the District, and not solely for the cities of Washington and Georgetown. It will probably be replied to this, that a soap-and-candle factory, carried on in the neighborhood of dwelling-houses and in a portion of the city considerably built up, may properly be deemed a nuisance, and Bates be reasonably required to remove this factory to some unsettled and unoccupied portion of the District, if he can find such a place.
The facts in this case show that for almost half a century (over forty-six years) Bates and his ancestors have prosecuted continuously the business of manufacturing soap and candles at this same place. At the time when, and the place where, this factory was established, it could not, we know historically at least, have been a nuisance, except to those employed in it and the frogs and owls of that neighborhood, which chiefly, if not solely, then composed the population of that vicinity. In the progress of improvement and increase of population in the vicinity of this factory, the lands were purchased and dwelling-houses built upon them, and such other buildings as were necessary and convenient for the ordinary business of men, at much less rate per foot, doubtless, than could have been purchased on la Fayette or Franklin Squares. All the purchasers of these lots knew, or ought to have known, that Bates’s soap-and-candle factory was there, and they were under no legal or moral constraint to purchase a lot and build a dwelling-house by the side of it. It would be quite as legal, and certainly more equitable, for the board of health “ to enact and ordain that persons who have built dwelling-houses so near to Bates’s factory as to render their occupation ‘injurious to health ’ must instantly remove therefrom, under a penalty of not less than two nor more than twenty dollars per day.” I have before stated that the power assumed by the board could not be conferred on it, for the reason that it would practically effect a confiscation of Bates’s property “ without due process of lato.” How far the proceedings *447 against Bates conform to due process of laio it would seem idle to inquire; yet it may be pertinent, in this connection, to repeat what has been said by learned judges as to the meaning of this phrase, due process of laic. To do that, I quote at some length from Comstock, J., in the case of The People vs. Wyenhamer, reported in the 3d of Kernan, 378, as expressing more clearly and forcibly my views of the law than I can hope to do by any lauguage of my own.
Speaking of the limitations of legislative power under our form of government, and particularly of that provision in the fifth amendment of the Federal Constitution, he says:
“These provisions have been incorporated, in substance, into all of our State constitutions. They are simple and comprehensive in themselves; and I do not perceive that they derive any additional force or meaning by tracing their origin to Magna Gharta, and the later fundamental statutes of Great Britain. In Magna Gharta, they were wrested from the King as restraints upon the power of the Crown. With us, they are imposed by the people as restraints upon the power of the legislature. Ko doubt, it seems to me, can be admitted of the meaning of these provisions. To say, as has been suggested, that the ‘law of the land' or ‘due process of law’ may mean the very act of legislation which deprives the citizen of his rights, privileges, or property leads to a simple absurity.
The Constitution-would then mean that no person shall be deprived of his property or rights unless the legislature shall pass a law to effectuate the wrong, and this would be throwing-restraint entirely away. The true interpretation of these constitutional phrases is, that where rights are secured by the existing law, there is no power in any branch of the Government to take them aicay; but where they are held contrary to the existing law, or a forfeiture by its violation, then they may be taken from him, not by an act of the legislature, but in the due administration of law before the judicial tribunals of the State. The cause or occasion for depriving the citizen of his supposed rights must be found in the law as it is, or at least it cannot be created by a legislative act which aims at their destruction. Where rights of property are admitted to exist, the legislature cannot say they shall exist no longer, nor will *448 ifc make any difference although a process and a tribunal are appointed to execute the sentence. If this is the ‘law of the land’ and ‘due process of law’ within the meaning of the Constitution, then the legislature is omnipotent.”
“Clear as this matter stands upon principle,” says Com-stock, J., “it is equally well settled by authority.”
“ Chief-Justice Gibson, of Pennsylvania, speaking, of a similar clause in the constitution of that State, and the right of property protected by it, said, ‘What law ? Undoubtedly a pre-existing rule of conduct, not an ex-post-facto rescript made for the occasion. The design of the convention was to exclude arbitrarypower from every branch of the Government, and there would be no exclusion of it if such rescripts or decrees were to take in effect the form of a statute. The right of property has no foundation or security but the law; and when the legislature shall successfully attempt to overturn it the liberty of the citizen will be no more.’ Norman vs. Heirst, 5 Watts and Serg., 193. And Chief-Justice Bronson, of this State, in the case of Taylor vs. Porter, 4 Hill, 175, said: ‘ The words law of the land, as here used, do not mean a statute passed for the purpose of working the wrong. That construction would render the restriction absolutely nugatory, and turn this part of the constitution into mere nonsense.”
So to the same effect the opinion of C. J. Ruffin, of North Carolina. In the case of Hoke vs. Henderson, 4 Dev., 15. Chancellor Kent, 2 Com., 13, says: “ The words lato of the land, as usedoriginally in Magna Ghartain reference to this subject, are understood to mean due process of law; that is, by indictment or presentment of good and lawful men; and this, said Lord Coke, is the true sense and exposition of those words.” The better and larger definition of due process of law, says Kent, “ is that it means law in its regular course of administration through courts of justice." See Story on Const., 661; 10 Yerger, 59; 2 Coke’s Inst., 45, 50.
The views thus expressed by Comstock, from whom I have just quoted at some length, were concurred in by such eminent judges as Johnson, Selden, and Davis.
Since the foregoing was written, my attention has been called to the case of Bartemyer vs. The State of Iowa, decided by the Supreme Court of the United States, reported in the *449 April number of the American Law Register, 1874, vol. 13, No. 4. On a careful perusal of the case, I do not see that its decision conflicts with any principle I have attempted to maintain as applicable to this case.
I will not attempt to define the limits or extent of what is termed the police power of the State. This power is very ill-defined by courts, and is perhaps undefinable. The best attempt at it I have seen will be found in the opinion of Justice Field in the case last before referred to, in which he says : “I have no doubt of the power of the State to regulate the sale of intoxicating liquors, when such regulation does not amount to the destruction of property in them, the right of property in an article, the person to sell and dispose of any such article, as well as to use and enjoy it. Any act which declares that the owner shall neither sell it or dispose of it, nor use or enjoy it, confiscates it, depriving him of his property without due process of law."
I will only add, that where the right to regulate the use of property is so exercised as necessarily to effect a confiscation of the property, it overthrows all constitutional limitations of legislative power. All power, when conferred, whether executive, legislative, or judicial, is impatient of restraint or limitation, and it was well observed on the argument of this case that, as a general rule, the less the power conferred the more was assumed.
But it is argued, in the second place, that although this ordinance be void and inoperative, yet Bates has mistaken his remedy ; and for that cause the writ of certiorari should be dismissed. It is claimed that whenever an appeal is given from the decision of a subordinate tribunal to a superior, the common-law writ of certiorari will not lie, and numerous cases are cited which are supposed to establish this position. These cases, when examined, will not, I think, be found such authority as is claimed for them. 1st, the office of the common-law writ of certiorari has always been the appropriate remedy to review the proceedings of a subordinate tribunal which has proceeded, or is proceeding, to judgment without jurisdiction of the subject-matter or of the person or the property proceeded against; whereas the office of an appeal is to give to a party believing himself aggrieved a retrial of *450 his cause before another tribunal. Suppose the police court entertain a suit for a divorce and is proceeding to judgment, would au appeal from its judgment be the appropriate remedy? Upon appeal, there would be no retrial of the case; neither the police court nor the appellate court (criminal) having any jurisdiction whatever of the subject-matter. Still worse, suppose the police court proceeds to judgment, or is in progress of doing so, against a person charged with some criminal offense, who has never been arrested, or in any way served with the legal process notifying him of the proceeding against him; in other words, no jurisdiction of his person having been obtained, the court, however, proceeds to judgment, and imposes a fine, or fine and imprisonment. Is his only remedy by appeal ? By bringing an appeal in such case, which is simply asking a retrial, he appears in court, subjects himself to its jurisdiction, and thus obviates the very objection against the proceedings in the police court of which he complains. The appellate court then, by the appeal, having jurisdiction of his person, I do not see why it may not proceed to try the cause upon its merits. The writ of certiorari has frequently been adj udged the appropriate remedy when an inferior court having jurisdiction of the subject-matter and of the person yet proceeds irregularly orcontrary to the prescribed rules of law. In such case, if no appeal be given, the only appropriate remedy is by the common-law writ of certiorari. These distinctions I have pointed out will, I thiuk, reconcile all the adjudicated cases referred to in the briefs cited to show that when an appeal is given from the judgment of a court of inferior jurisdiction, the writ of certiorari will not lie. Looking through the ordinance enacted by the board of health it seems to me to be a wholly mistaken view of the powers conferred upon it, and to exemplify the wisdom of the maxim ne sutor ultra crepidam, which, liberally interpreted, may mean “Doctor, stick to your lancet and bolus.” New men learned in the law, and still fewer legislative assemblies, have had the wisdom to enact a code of municipal law which has had more than a butterfly-life, and it is by no means extraordinary that this code of municipal law, for such it is so far as it goes, should turn out a failure.
This simple and wise provision authorizing, as I have *451 attempted to show, the board to declare what nuisances are injurious to health, and- directing them to provide for the removal thereof, is construed to mean a power to declare anything a nuisance which in their judgment is injurious to health; and having thus been made a nuisance, maybe dealt with as such, under the power given for the removal of such nuisances as are injurious to health, with one or two solitary exceptions. The power to remove is attempted to be exercised by imposing a penalty of greater or less amount. This, it seems to me, is no provision for the removal of a nuisance, especially of one injurious to health.
We were informed on the argument of this case that the board of health, before enacting this ordinance in question, procured the opinion of counsel learned in the law as to the true meaning of the section of the statute before quoted, and as to what power was by it conferred upon the board; and, further, that an application was made to the Department of Justice as to the true construction of the act of Congress in question, and that, in both cases, the board was advised that the act gave the power to do what the board has done in enacting the ordinance in question. This court, I trust, will always listen with distinguished consideration to the opinions of men learned in the law, even when well paid for giving their client such an opinion as desired. The opinion from the Department of Justice isa little remarkable in several respects. In the first place, it says if the punctuation of the statute were altered and one word added thereto, the statute would confer the power attempted to be exercised by the board. In reference to this matter, I have only to say I do not perceive what the Department of Justice has to do with construing ah act of Congress applicable to this District. Judges are appointed mainly for the purpose of deciding what the law is, but if such a barnacle as the Department of Justice can be attached to the administration of the law to construe statutes, judges would seem to be useless, expensive, and unnecessary.
Secondly, I observe it is not the business of judges to alter the punctuation of statutes, much less to add words to or subtract words from it, if, upon considering it as written *452 and punctuated, they can perceive with reasonable certainty what the statute means.
But doubtless we are favored with the opinion of counsel and also that of the Department of Justice as evidence that the board of health was actuated by an honest desire to learn the extent of the power conferred on it, and to discharge its whole duty. That needed no evidence. This whole community, I think, recognize the great services this board have rendered it for the few past years. Beyond doubt hundreds of the people of this District are to-day alive by reason of the faithful, intelligent, and well-directed efforts of this board of health; and it is refreshing in these days to see men of learning and skill devote themselves assiduously to the important duties imposed upon them, for a salary so contemptibly meager. But for the reasons I have assigned, I think the motion to set aside the writ of certiorari should be denied, and that a judgment in favor of Bates, dismissing the proceedings in the suit commenced before Justice Snell, should be entered,